Thank you. May it please the court, my name is Robert Loeb from Oreck Harrington and I represent Midas Life Settlements in this appeal. And I ask to reserve four minutes of my time for rebuttal. Since at least 1883, it has been firmly established the law of Minnesota that where a person is authorized by the insurance company to sell their policies and authorized to submit it for approval, and that person who is so authorized puts false information in the application. And if the insured is unaware of that false information, the insurance company cannot deny, cannot rescind the policy based on those misrepresentations. And the Supreme Court of Minnesota has been very clear, rejecting formalistic notions of agency, saying it is if the person is authorized to procure applications and to forward those applications for approval. Why this special rule in this case, which is different than other contract contexts, other agency contexts, is because the Supreme Court of Minnesota has long recognized the unique dangers that arise in this context of insurance and the great need to incentivize the insurance companies to rein in their own agents, their own sellers of their policies. As Hansel said, the insurance companies supply the sellers of the insurance policies with blank, printed forms. They promise them liberal commissions, and that was in the late 1800s. Today the commissions are much more lucrative. It sends them out to the world dealing with the public with a great disparity of knowledge and expertise regarding matters of insurance. So there's a great danger of inducement to get policies that are not appropriate for the insured, a great danger of incentivizing the agent to put false information in the application. That's why the Minnesota courts have long said where the falsehood, where the misrepresentation comes into the policy through the acts of the person authorized to procure applications and forward them to approval, the insurance company cannot deny the policies. This rule, however, quoting from Pomeranke, is confined strictly to those instances where the application is made out by an insurance agent acting in the scope of his agency. That's Minnesota law, the case you most strongly rely on. The Cancel case and all its progeny, including Pomeranke, have reiterated the language of Cancel again and again that the parties that the insurance company is responsible for is those authorized to procure and authorized to forward for approval. I think, Judge Loken, the Pomeranke case is a very strong example of that. So in the first part of Pomeranke, the question was, was this person who was authorized to sell and submit the agent of the insurance company in the sense that they can be cross-examined? In this case, there is no factual relationship to Pomeranke. I'm just reining in your overstatement of Minnesota law. Well, let me finish my thought about Pomeranke in that there, the court said you cannot treat this person as the agent of the insurance company for the purposes of cross-examining them because they are not employed by the insurance company. They're not their agent in that formal sense. And so they said you cannot cross-examine them as the agent of the insurance company. Then it came to applying CanCell, and they said a different standard because in a much more pragmatic way, you sent them out in the world and authorized them to sell and to submit the applications, they fall right in the heart of CanCell. And there, even though the party there, the insured, didn't even read the application over as was required, the court said that the policy incentives required under Minnesota law requires that the insurance company bear the burden where the source of the misrepresentations come from the person authorized to sell and to submit. So let's look at the facts here. The district court here found after a bench trial, a long bench trial, that Ms. Joseph, the insured, the applicant here, was not a participant in putting in the false information in the application. After this bench trial, the district court found that she had no knowledge of the misrepresentations at all, that it was all the work of Diverse, primarily of Roy Deckel, the principal there, and together with his employees, John Jean and others, said that Diverse was the ground zero of fraud. And we know, if we're going to look at agency, that in the record here at page 276 and 277, that Diverse is authorized by PHL expressly to sell their policies and to submit them for approval. And that is exactly what the Cancel case and the Pomerant case are speaking to, is to that authority. So this case, you know, falls right in the heart of those cases, Your Honor. PHL's argument today boils down to the notion that they should avoid liability for the act of Diverse, who they authorized to sell their policies and to submit them for approval under the words of Cancel, because the Diverse took the extra step of installing John Jean as the trust protector here. And they argue that you should impute his knowledge of the fraud onto the innocent parties here, onto Ms. Joseph, onto the trust, and onto the lender, and that they all should suffer for the wrongdoings of those selling the policy here, Diverse. But the language of Cancel is very instructive. It says the insurance- Was innocent? You're saying the district court ruled that way? The trust- Did you say your client's affiliate? The trust- The process of writing a fraudulent policy application? No, Your Honor. There's no evidence. There's no finding of that by the district court. The trusts are standard operating procedures where there's going to be a premium financing. That's done over hundreds and thousands of policies, Minnesota and nationwide. And so you have a lender here, you have the trust here, none of them are parties to this fraud, Your Honor. There's no evidence. Didn't the district court rule that the question was whether the insured or the beneficiary or the trust was aware of the false application? And the district court said so because John Gene, who was affiliated with Diverse and was placed there, knew of the fraud and imputed his knowledge to the trust. And therefore said, looking under agency principles, that his knowledge of the fraud should be imputed to the trust. So Cancel explains that a special rule here applies that is different than ordinary agency principles. It said the insurance company is responsible for paying for the policy when the agent is authorized to sell the policy and for all that is said and done by those individuals authorized to sell the policy, all that is said and done in regard to the application and the submission of the application. So they installed John Gene as trust protector so that John Gene would authorize the application to be submitted to PHL. That falls right in the heartland of Cancel. The district court judge says the case law here is scant in how you deal with the circumstance. But it's really in the heartland of Cancel that this falls within the steps taken by those authorized to sell, authorized to submit the application, and all that is said and done in regard to that application, which includes the acts of John Gene working with Diverse to make sure that the policy was submitted to PHL for approval. And it would be a perverse result, Your Honor, to say that the fact that these very agents who are the ones that the insurance company is supposed to be incentivized to rein in, the whole notion of Cancel and Pomerank and why you're giving responsibility for the insurance company is you're giving them a financial incentive to rein in the rogue, unscrupulous agents. They're supposed to supervise them. They're supposed to monitor them. They're supposed to make sure that they aren't putting misstatements, false statements in these applications. And when they do, the insurance company needs to bear that burden. And if you allow them to escape that liability, you're undermining the incentive scheme created by the Minnesota courts. You're allowing PHL to keep the $300,000-plus of premiums that they recovered. You're allowing the people who were the ground zero of fraud, in the words of the district court, to keep their commissions. PHL hasn't gone after them, and they're happy to, you know, they're probably off to their next scheme. And you're giving these people the incentive to do it again and again against innocent people just like Ms. Joseph. And Ms. Joseph is clearly, and her daughter, Helen Ramsey, clearly the victims of this fraud, right? So they wanted insurance. She wanted insurance for her daughter. How many dollars? The record's not clear on the amount that she was seeking. What is she out? What is the daughter out? Or Ms. Joseph? Well, Ms. Joseph has passed away, and her daughter would be the beneficiary of a life insurance policy. Had it not been for the fraud of these agents, some legitimate policy would have been issued here without any false statements, and there would have been a... Is it in the record what sort of policy, how big a policy would have been issued had her financial circumstances been revealed? No, Your Honor, because... It would have been tiny. It may be so, but the application... But let's... I mean, the victim we're talking about are the affiliates of the fraudsters who now have ownership of the policy. The person owning the policy here, there's no thing in the record suggesting that they're the affiliates of the fraudsters, Your Honor. The district court found the fraudsters here were diverse. These were the people authorized to sell the policy by PHL. They are not affiliated with PFG. They're not affiliated with the trustee, or in any other way, or the current owner of the policy. Now, the district court's rationale in response to your argument, as best I can see it, is on pages 19 and 20, where the court says there can be no agency without the principal's consent. There's no evidence that PHL agreed that Gene could act on PHL's behalf in assuming the role as trust protector. Therefore, when he went beyond the insurance broker role to the trust protector role, he shifted from an agent of PHL to an agent of the trust. Is that how you understand the order, and what's your response to that? Absolutely, Your Honor. He was trying to apply standard agency principles and contract principles to a context where the Minnesota Supreme Court says there is a special rule that trumps ordinary agency principles, that the insurance company cannot argue that they are not responsible for this policy when the persons who are selling it are the ones who put the false information in. And for all the acts they do, which is all said and done by those individuals in regard to the application being submitted. So as a trust protector, they put him in place so he could do exactly what he did do, press the button, tell the trustee to submit the application. And the trustee did submit it, and he submitted it with a letter to PHL saying that we are submitting this application here, but we, the trustee in charge of the trust, are not verifying any of the statements or facts in the application. That's between Mrs. Joseph and the insurance agents who are submitting it to you. And so there's no issue here that PHL relied upon the trust or the trustee in the truth of their statements here. If not you have further questions, I want to reserve the remainder of my time for rebuttal. Mr. Hetherington. Good morning, your honors. May it please the court. It's my privilege to be here before you today. Let me start with a bit of clarity. This case is not about an innocent insured, and it's not about agency, which is exactly why the district court was correct in saying that the agency arguments offered below held no water. This case is about the counterparty to an insurance contract, the policy owner committing fraud. The trust applied for this policy. The trust was the beneficiary. The trust was created by these folks over here. It was created by their affiliate as part of this premium financing transaction, which was a total sham. These people ended up owning a thousand policies. And they're in here today telling you that Miss Ramsey, the daughter of Miss Joseph, would have gotten a policy in some amount. The reality is that this policy was always intended to go to these people. They botched it up. The court didn't even have to get to that. The court simply took the easiest and most straightforward approach he possibly could, which was to say that a policy owner cannot commit fraud in Minnesota. There is not a single Minnesota case, Pomeranke, Cancel, Suryang, or any of the other cases that the other side relies on, that suggests that a policy owner can commit fraud and the policy cannot be rescinded. It simply doesn't exist. The trust here could only act through the protector. Miss Joseph settled the trust, appointed Johan John Jean as the protector. That's clear from the record. It's clear from the findings of fact. The administrative trustee, they set up this trust, this trust agreement, to have a credible bank be the administrative trustee. And then they come in and say, oh, the bank sent in an ownership statement saying we're not making any representations. Of course the bank wasn't. They sent in the statement saying this contract, this trust, which is a creature of contract, vests all the discretionary authority in the trust protector. And so the argument is that somehow my client, PHL, has authorized the counterparty to this insurance contract to defraud us. There's absolutely no basis for it under Minnesota law. This is fraud. And this decision, which is thoughtful, well-reasoned, and followed a six-day trial before a very, very good judge, should be upheld. Now, because so much of this has focused on Cancel and Pomeranke and Sir Yang, I want to address those arguments. The Cancel case and the Pomeranke case have nothing to do with this case. You never get there because the trust committed fraud. But even if you looked at this as an insured issue as opposed to the trust being the owner and the applicant for this policy, what you would see is that there essentially are four elements to this. The first, as Judge Loken pointed out, is that an agent has to act within the course and scope of his agency in taking an application for insurance. In this case, who's the agent? The producer on the policy is a woman named Shana Goldberg. The district court found that that license was procured by fraud. So PHL thought that its, quote, producer or agent, if you want to use their argument, was this woman named Shana Goldberg who testified she never talked to the insured, never sought to be appointed in Minnesota, even though four companies appointed her as a producer in this state. So who is the agent? There's not a shred of evidence in the record of who this woman spoke to. Not any. There's not a single person that said, I talked to her. Johan John Jean talked to her husband once. He never talked to her. That's a finding of fact in the order. Shana Goldberg, the producer, never talked to her. Roy Deckel, who was never appointed with PHL and is, quote, ground zero for the fraud in the order. He said he was not aware of anyone in Diverse that ever talked to her. So we don't have an agent. To Ms. Joseph. Yes, Your Honor. So we don't have an agent in the course and scope of his agency. But more importantly than that, the other factor in all those cases, Pomeranke makes it very clear, but Cancel is just crystal clear on this, is that those cases, in those cases, the insured has to convey truthful information to an agent acting within the course and scope of his or her agency. In Cancel, the court says it four times. They use the phrase correctly stated, truthfully informed, fully and correctly stated, fully informed. Every one of these cases involves an agent. In many cases, the employee of a company, which Cancel also states, it talks about how companies employ these people. It involves an agent and a human being in the living room, Your Honors. They go in the living room. There's an exchange of information, and the agent incorrectly records the information. That's what this exception to the objective theory of contract is supposed to do. That's what this exception is all about, is to correct errors made by the agent when there's a full and fair exchange of information. There is literally not a shred of evidence in this record that Ms. Joseph ever conveyed any information to anyone. The judge found, as a matter of fact, that she likely signed a blank application. The third element in Pomeranke and Cancel and all of those cases, Sir Yang from this court, is that the insured had to rely in good faith, or that the agent misrecorded the information without the insured's fault, knowledge, or collusion. Fault, knowledge, or collusion. Here we have a blank application signed by an insured. That's fault. Whether she knew or didn't know, she doesn't meet the element of Pomeranke. And then finally, the fourth element of all of those cases, is that she had to sign it without reading it in reliance on the good faith of the agent. Again, we don't even have an agent here, number one. And number two, there's no evidence at all that she relied on anything. She simply signed a blank application. There is nothing in Minnesota law that suggests that this situation is one in which Cancel, Pomeranke, Sir Yang, or any of those cases apply. And in fact, the Shaughnessy case from 1925 actually looked at Cancel. And the Minnesota Supreme Court said there's no evidence that any truthful information was conveyed. Because that is really the touchstone of the exception. It's if you have an insured who's doing her best in good faith to provide the information. And by the way, in all of these cases, these were non-medical policies. They were mostly small policies where they're just asking a few questions and getting answers about health information. In all of these cases, there is truthful information conveyed, or at least a disputed fact, as in Sir Yang, where the court said, hey, let's go see if a jury can determine whether or not she relied in good faith. Here, we have nothing like that, nothing at all. This is an absolute massive fraud. It hasn't been challenged. They admit that it's a fraud. It was committed by people who fraudulently procured their producer license. And their argument before this court is that PHL should bear the burden for the benefit of a lender who financed this thing through a sham premium finance loan with a trust they created. Their argument is PHL should bear the burden of that, and they should get a $10 million lottery ticket. It is absolutely ludicrous. It's not supported by Minnesota law. I'd also like to point out just briefly, Your Honors, that there were three issues essentially argued below. The judge stopped after the first one, I believe because he found it so obvious that a policy owner can't commit fraud. But there were two other issues. There's one you're going to hear about in the next argument, the insurable interest issue. And the second one is this ownership issue, which they botched up how they transferred the policy to themselves. But the reason I raise it is because their whole argument under Pomeranke and Cancel rests on this innocent insured theory. They can't have it both ways. If she was really an innocent, if she really didn't know, if she really had no idea that this amount of insurance was procured on her life, that's the end of this case. There's no insurable interest. You can't, even with an insurable interest, you can't procure a policy without the knowledge and consent of the insured. That's the Dyke case from 1937, the Minnesota Supreme Court. So even if you were to believe that a policy owner could commit fraud, and somehow the insurance company would still be on the hook for it because the insured was innocent, you would have to find that the policy violated Minnesota public policy because the policy was taken out without her knowledge and consent. So they can't thread the needle in this case. We had a long trial, Your Honors. The rules that they rely on are designed to protect the insured in a dispute with the company when there is a dispute between the insured and the company's representative as to what happened. There is no question that the agency course and scope distinction exists under Minnesota law. The Eddy case is still good law. These people were clearly brokers if they were anything, even though they procured their brokerage arrangement by fraud. And they had limitations in their brokerage agreements. There's simply no basis for holding PHL responsible for anything that they did. And for Mr. Gene acting in the role of the trust protector, again, they set up this trust. He was the only person that was authorized to act, take any discretionary act for the trust, and he committed fraud. And that's the beginning and end of this case. Unless the court has questions, that's all I have, Your Honor. Thank you very much. Let me just make a few points. My colleague here made the point of attacking Ms. Joseph that she is not an innocent party and that we're asking you to rule for the benefit of the lender. We're asking you not to decide who gets the benefit of this policy, Your Honor, but to determine whether the insurance company, based on misrepresentations by people it authorizes to sell and submit the policy, is responsible for that policy. The question of who then gets the benefit is something then for the district court to decide on remand. They mentioned the issue of ownership, which the district court didn't reach, but I think it's telling that if we think we're right that our client owns the policy, all the transactions, we're fine, happy to discuss that. But if they're right, who owns the policy? It would be, under Minnesota law, under a constructive trust for Helen Ramsey, for Ms. Joseph's daughter. Ms. Joseph is not someone who wasn't seeking insurance. She was seeking insurance for her daughter, a classic insurable interest issue. Again, that's our issues for the district court. He's trying to argue different things than the district court decided. So this court needs to decide whether these misrepresentations put in the policy by the people authorized to sell the policies by a PHL. In the record, it's clear that Diverse is authorized to sell the policies. There's no question about that. And then there's going to be a question of who then will get the benefit of the policy, whether Helen Ramsey or my client. But that is not the issue before this court today. They say Ms. Joseph was at fault here. The Minnesota courts are very clear about the strong policy incentives here, that in the Pomeroy case, even though the insured signs the policy without reading it, they said that's fine. Even if you have clauses, as this court said in Sir Yang, or the Minnesota court said, even if there's a clause in there, a warranty clause saying I, the insured, verify every statement that you sign it, the Minnesota law and policy says the insurance company cannot shift liability based on such formalisms. Likewise, as to whether she signed it where it was in part filled in or not, and there's not a clear record on that, the Minnesota cases, again, reject that kind of formalism. In the Hafner case, in the Sir Yang cases, there were parts of the application which were later filled in by the insurance agents. And again, the courts there were saying that the policy prerogatives behind Cancel, behind Pomeranke, you know, trump these formalistic things such as PHL is arguing today. PHL argues that it's innocent here, but they had red flags as to the false information that was in the policy. In the application itself, there was a submission of a financial statement. Your Honor, based on established law of Cancel and Pomeranke, we think the law is clear and that this court should then reverse and remand for if there's going to be a ruling on the insurable interest issues, on the ownership issues, that has to be reached by the district court in the first instance. But we believe the district court erred in applying these facts under Cancel and Pomeranke. Thank you. Thank you, Counsel. The case has been thoroughly briefed and argued, and I guess the same teams are up again, so.